**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| SUNSTONE HOTEL INVESTORS, INC., | Case No.: SACV 20-02185-CJC(KESx) |
| Plaintiff, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF SUNSTONE HOTEL INVESTORS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. 35] AND DENYING DEFENDANT ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. 38] |
| ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, | |
| Defendant. | |

I

Nothing has quite tested the principles of insurance law more in recent memory than the COVID-19 pandemic.  When the pandemic began in early 2020, governments at all levels struggled to respond to the virus.  With little known about its origin, spread, or possible cure, panic ensued and daily in-person life crumbled.  Worse, over six million people have died in COVID-19's short and unpredictable existence.[1]  The United States alone has had approximately 85 million cases and over one million deaths.[2]  Even as death tolls have slowed, the virus's severe impact remains.

Industry was also impacted.  The in-person operations of some sectors in particular—airlines, schools, courts, fitness centers, restaurants, elective health centers, sports, entertainment, and lodging accommodations—grinded to a halt.  Businesses of all sizes struggled to stay afloat.  Many companies turned to their commercial insurance providers for relief, often presenting strained interpretations of their run-of-the-mill "direct physical loss or damage to property" policies.[3]  Their requests for coverage under those policies were denied. [4]

But this case involves a very different insurance policy.  In 2017, Plaintiff Sunstone Hotel Investors, Inc. ("Sunstone"), a real estate trust with an interest in several

---

[1] World Health Organization, WHO Coronavirus Dashboard, *available at* https://covid19.who.int/.
[2] Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home.
[3] *See* University of Pennsylvania Carey Law School, Insurance Law Center, Covid Coverage Litigation Tracker, *available at* https://cclt.law.upenn.edu/.
[4] *See, e.g.*, *Dakota Girls, LLC v. Philadelphia Indemnity Insurance Co.*, 17 F.4th 645 (6th Cir. 2021) (finding no "loss of" or "damage to" property coverage for the shutdown of plaintiff's preschools due to COVID-19); *Inns-by-the-Sea v. California Mutual Ins. Co.*, 71 Cal. App. 5th 688 (2021) (finding the suspension of five of plaintiff's lodging facilities did not directly result in recoverable lost business income under the specific insurance policy plaintiff purchased); *Terry Black's Barbecue, L.L.C. v. State Auto Mut. Ins. Co.*, 22 F.4th 450, 458 (5th Cir. 2022); *Greenwood Racing Inc. v. AM Guar. & Liab. Ins. Co.*, 2021 WL 5050087, at *6 (E.D. Pa. Nov. 1, 2021).

hotels across the country, purchased an insurance policy from Defendant Endurance American Specialty Insurance Company ("Endurance").  The policy was not for your run-of-the-mill "physical loss of or damage to property" coverage but for expansive site environmental impairment liability coverage.  With almost prescient insight, Sunstone paid a significant premium for an aggregate maximum of $40,000,000' worth of insurance to protect itself against all kinds of events, including $25,000,000 of coverage for business interruption losses resulting from a virus.  When one of Sunstone's hotels, the Marriott Boston Long Wharf, was forced to close after it allegedly became the site of the first super-spreader event in the United States, Endurance denied Sunstone's claim for business interruption losses in full.  (Dkt. 1 [Complaint] ¶ 2.)  This lawsuit followed.

Now before the Court are the parties' cross motions for partial summary judgment. The Court is tasked with resolving how to interpret the relevant policy provisions governing coverage for Sunstone's pandemic-related losses under its site environmental impairment liability policy.  Unlike the policies presented to other courts which have found that no coverage exists for pandemic-related losses, this Court finds that Sunstone's policy must be interpreted to encapsulate the very thing for which Sunstone seeks coverage.  For the following reasons, Sunstone's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** and Endurance's motion is **DENIED**.

II

A

Sunstone is a lodging real estate investment trust that has, or at all relevant times had, an interest in 20 hotel properties comprising approximately 10,000 guest rooms across the United States operating under world renowned brands, including Hilton, Hyatt, and Marriott.  (Dkt.1 [Complaint, hereinafter "Compl."] ¶ 1.)  Given its national

operation in the hotel and hospitality industry, in 2017 Sunstone purchased a Sompo Global Risk Solutions "Site Environmental Impairment Liability Coverage" policy, No: GER10011343500 ("the Policy") from Endurance.  (Dkt. 37-1 [hereinafter "the Policy"].) The Policy provides seven different kinds of insurance coverage, including $25,000,000 of coverage for business interruption losses caused by a biological agent.  (*Id.* at 14.)  The Policy was in effect from June 22, 2017 to June 22, 2020, (*id.* at 13), and has a $40,000,000 maximum aggregate limit of liability, (*id.* at 14).  Below is a full list of the different kinds of coverage the Policy provides and their corresponding limits of liability:

| A. | Coverage A - Pollution Condition(s): | Yes | $25,000,000 | $100,000 | N/A |
|----|--------------------------------------|-----|-------------|----------|------|
| B. | Coverage B - Nonowned Disposal Sites: | Yes | $25,000,000 | $100,000 | N/A |
| C. | Coverage C - Biological Agent Condition(s): | Yes | $25,000,000 | $100,000 | N/A |
| D. | Coverage D - Business Interruption and Extra Expense: | Yes | $25,000,000 | 3 days | N/A |
| E | Coverage E - Disinfection Condition(s) Expense: | Yes | $1,000,000 | $100,000 | 06/22/20 |
| F. | Coverage F - Transportation: | Yes | $25,000,000 | $100,000 | N/A |
| G. | Coverage G - Public Relation Expenses | Yes | $1,000,000 | $100,000 | N/A |
| H. | Coverage H - Diminution In Value: | Yes | $10,000,000 | $100,000 | N/A |

These cross-motions concern only one of these coverages, "Coverage D" for "Business Interruption Losses and Extra Expenses."  (Policy § I.D.)  Coverage D, in relevant part, provides that Endurance shall pay "the **Insured's Business Interruption Losses** and **Extra Expenses** during the **Interruption Period** that directly result from . . .

**Biological Agent Condition(s)**: . . . [o]n or under a **Scheduled Location**[.]"[5]  (*Id.* § I.D.1.)  There is no dispute here that the Marriott Boston Long Wharf is a Scheduled Location under Coverage D and that COVID-19 is a Biological Agent.  (Stip. ¶ 2.)  But the parties take very different positions on the scope of insurance Coverage D provides.[6]

The Policy defines several of the terms referenced in Coverage D that are relevant to the parties' dispute.  The relevant terms include "**Business Interruption Losses**" defined as "[t]he actual loss, including **Loss of Rental Incom**e . . .  that would have been earned or incurred by the Insured during the **Interruption Period** in the absence of suspension of the Insured's operations[.]"  (Policy § VIII.6.a.)  Also relevant is the term "**Biological Agent Condition**" which is defined as "the presence of Biological Agents [viruses or other pathogens] at, upon or within a Scheduled Location[.]"  (*Id.* § VIII.4.)

Much of the parties' dispute focuses on how the term **Interruption Period** is defined in the Policy.  The Policy states that the Interruption Period begins when a "Biological Agent Condition(s) directly interrupts the Insured's operations at a Scheduled Location[.]"  (*Id.* § VIII.24.a.)  It "ends upon the earliest" of four possible events.  (*Id.* § VIII.24.b.)  The only relevant event for these motions is the first.  It states that the Interruption Period ends when "[t]he . . . Biological Agent Condition(s) no longer is a source of the interruption to the Insured's operations, regardless of whether the interruption is continuing for any other reason after the . . .  Biological Agent

---

[5] All bolded terms are defined in the Policy.

[6] Coverage D has two main sections.  (*See* Policy § I.D.)  Under Section D.1, the Interruption Period is triggered by the presence of the virus at the hotel itself.  (*Id.* § I.D.1.)  Under Section D.2, the Interruption Period is triggered by the presence of the virus within five miles of the hotel.  (*Id.* § I.D.2.)  Neither party has moved for summary judgment on Section D.2 so the Court need not resolve any issues pertaining to coverage under that provision.  (*See* Endurance's MSJ; Sunstone's MSJ.)  Nothing in this order precludes either party from filing any motion addressing coverage pursuant to Section D.2 of Coverage D.

Condition(s) has been addressed[.]"  (*Id.* § VIII.24.b.i.)  Specifically, this provision provides:

> 24. **Interruption Period**  means the period of time that:
>
> a.  begins when a **Pollution Condition(s)** or **Biological Agent Condition(s)** directly interrupts the **Insured**'s operations at a **Scheduled Location**; and
>
> b.  ends upon the earliest of when:
>
> i.  The **Pollution Condition(s)** or **Biological Agent Condition(s)**  no longer is a source of the interruption to the **Insured**'s operations, regardless of whether the interruption is continuing for any other reason after the **Pollution Condition(s)** or **Biological Agent Condition(s)** has been addressed;

The Policy excludes from the Interruption Period "any delay caused by the enforcement of any local or state ordinance or law regulating the construction, use or repair, or demolition of property."  (*Id.* § VIII.24.)  Additionally, "the Interruption Period will be deemed to have ended . . . even if operations cannot resume at the Scheduled Location for regulatory reasons . . . or . . . even if it is not physically possible for such operations to resume for reasons other than the physical presence of . . . Biological Agents at a Scheduled Location."  (*Id.*)

From February 24, 2020 to February 27, 2020, one of Sunstone's hotels, the Marriott Boston Long Wharf, hosted the Biogen Conference.  (Dkt. 42-1 [Sunstone's Response to Endurance's Statement of Undisputed Facts, hereinafter "Sunstone's RSUF"] ¶ 10.)  On or about March 5, 2020, Sunstone was informed by the Boston Public Health Department ("BPHD") that approximately three attendees of the Biogen conference tested positive for COVID-19.  (*Id.* ¶ 11.)  The next day, on March 6, 2020, Sunstone provided initial notice of its insurance claim concerning the presence of COVID-19 at Marriott Boston Long Wharf to Endurance.  (Dkt. 37 [Parties' Joint Stipulation of Facts, hereinafter "Stip."] ¶ 6.)  On March 8, 2020, Endurance acknowledged receipt of the claim.  (*Id.* ¶ 7.)

Between March 6, 2020 and March 14, 2020, certain portions of Marriot Boston Long Wharf were cleaned by a third-party contractor.  (*Id.* ¶ 8; Sunstone's RSUF ¶ 12.)  On March 11, 2020, BPHD informed Marriott Boston Long Wharf that if it "did not agree to 'mutually agree' to close the hotel, that the City of Boston would quarantine and close the hotel on its own immediately."  (Dkt. 45 [Endurance's Response to Sunstone's Statement of Undisputed Facts, hereinafter "Endurance's RSUF"] ¶ 1; Stip. ¶ 11, Ex. E.)  Marriott Boston Long Wharf subsequently agreed to suspend its operations for 14 days, (Endurance's RSUF ¶ 2), but hoped to reopen on March 27, 2020, (Stip. ¶ 10).

Before Marriott Boston Long Wharf could reopen, on March 23, 2020, the State of Massachusetts issued COVID-19 Order No.13, the "Order Assuring Continued Operation of Essential Services in the Commonwealth, Closing Certain Workplaces, and Prohibiting Gatherings of More than 10 people," requiring the closure of all non-essential businesses in the state (the "Massachusetts Order").  (Sunstone's RSUF ¶ 19; Stip. ¶ 15.)  The Massachusetts Order took effect the following day on March 24, 2020.  (*Id.* ¶ 20.)  Attached to the Massachusetts Order was an exhibit with a list of "COVID-19 Essential Services."  (Sunstone's RSUF ¶ 21.)  On March 23, 2020, the "COVID-19 Essential Services" exhibit included "[h]otel workers."  (*Id.*)  On March 31, 2020, the "COVID-19 Essential Services" exhibit was revised to remove "[h]otel workers" and add "[w]orkers at hotels, motels, inns, and other lodgings providing overnight accommodation, but only to the degree that those lodgings are offered or provided to accommodate the COVID-19 Essential Workforce, other workers responding to the COVID-19 public health emergency, and vulnerable populations."  (*Id.*¶ 22.)

The Massachusetts Order pointed out that "the Department of Public Health is urging all residents of the Commonwealth to limit activities outside of the home and to practice social distancing at all times, both inside and outside of the home to limit the spread of this highly contagious and potentially deadly virus[.]"  (*Id.* ¶ 23.)  Marriott

Boston Long Wharf remained closed until July 7, 2020, at which point it was safe to reopen in a limited capacity and the Massachusetts Order permitted it to do so.  (*Id.* ¶¶ 24, 25; Stip. ¶ 22; Dkt. 42-4 [Declaration of Ed Rocco, General Manager of Marriott Boston Long Wharf ISO Sunstone's Opposition to Endurance's MSJ, hereinafter "Rocco Decl."] ¶ 7 [Marriott Boston Long Wharf "resumed operations with modified services and hours of operation" in July 2020.].)

Sunstone filed a claim pursuant to its Policy on March 6, 2020.  (Stip., Ex. B ["General Liability Notice of Occurrence/Claim"].)  Sunstone explained that three of the Biogen conference attendees and two employees at Marriott Boston Long Wharf tested positive for COVID-19 and it was entitled to coverage under both Coverage C and Coverage D of the Policy.  (*Id.* ¶¶ 6, 8.)  Sunstone also asserted that Marriott Boston Long Wharf "was required to suspend its operations and had the use and functionality of [its] premises substantially impaired due to SARS-CoV-2, COVID-19, the subsequent actions and orders of state and local civil authorities, guidance from the Centers for Disease Control, and the need to mitigate our losses and damage."  (*Id.*, Ex. R [October 5, 2020 letter from to Sunstone] at 266.)

In an October 5, 2020 letter from Endurance to Sunstone, Endurance denied Sunstone's insurance claim in full, raising several issues and stating in part, "based on the information provided to date, there is no coverage available for the above-referenced claim under the Sompo Policy."  (Sunstone's RSUF ¶ 28.)

B

On November 13, 2020, Sunstone filed this action against Endurance over Endurance's refusal to cover any portion of Sunstone's insurance claim.  (Compl.) Specifically, Sunstone brought claims for breach of contract, anticipatory breach of

contract, tortious breach of the implied covenant of good faith and fair dealing, and declaratory relief.  (*Id.*)

In January 2021, Endurance moved to dismiss those claims, arguing in part that Sunstone could not recover under Coverage D because Sunstone did not allege that its losses were the direct result of COVID-19 as the Policy requires.  (Dkt. 13 [Endurance's Motion to Dismiss].)  This Court denied that motion, finding that Endurance's argument improperly rested on incorporating Coverage C's requirements into Coverage D.  (Dkt. 21 [Court's Order Denying Endurance's Motion to Dismiss] at 6.)  A few months later in May 2021, Sunstone moved for partial judgment on the pleadings on Endurance's "defense" that the Interruption Period under Coverage D only lasted for two days, the length of time it took to clean Marriott Boston Long Wharf in March 2020.  (Dkt. 27 [Sunstone's Motion for Partial Judgment on the Pleadings].)  The Court denied Sunstone's motion as well, finding that any determination concerning the scope of the Interruption Period should be made with the benefit of a more developed factual record.  (Dkt. 32 [Court's Order Denying Sunstone's Motion for Partial Judgment on the Pleadings] at 6.)

The parties now cross-move for partial summary judgment.  Specifically, Endurance moves for partial summary judgment on two issues: (1) how to interpret the provision that states that Sunstone's claimed Business Interruption Losses must be a "direct result" of a Biological Agent Condition; and (2) whether the provision governing the end of the Interruption Period requires that the Interruption Period end when the Massachusetts Order was enacted.[7]  (Dkt. 38 [Defendant Endurance's Notice of Motion

---

[7] Endurance also sought partial summary judgment on the appropriate measure of damages pertaining to Sunstone's Business Interruption Losses.  Since the parties devoted most of their briefing and analyses on the other issues the motions present, the record is not as developed on the measure of damages issue and is not yet sufficient for the Court to rule.  Accordingly, Endurance's motion for partial summary judgment on the issue of the appropriate measure of Sunstone's damages is **DENIED WITHOUT**

and Motion for Partial Summary Judgment as to Interruption Period, Direct Result Requirement, and Business Interruption Losses, hereinafter "Endurance's MSJ"].) Sunstone cross-moves for partial summary judgment on how to interpret the Interruption Period provision, maintaining that under the Policy the Interruption Period lasted until March 2021, but ended no earlier than July 7, 2020.  (Dkt. 35 [Sunstone's Notice of Motion and Motion for Partial Summary Judgment as to its Policy's Interruption Period, hereinafter "Sunstone's MSJ"].)

## III

## A

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). Summary judgment is proper when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual issue is "genuine" when there is sufficient evidence for a reasonable trier of fact to resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law.  *Id*.  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 249.  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 325.

When the nonmovant would have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S.

---

PREJUDICE.  Nothing in this order precludes either party from filing future motions for summary judgment on the appropriate measure of damages issue.

144, 158–60 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp.*, 477 U.S. at 325.  If the movant meets this burden, the nonmoving party must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  The court must examine all the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

The court does not make credibility determinations or weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).  But conclusory and speculative testimony in affidavits or moving papers is insufficient to raise triable issues of fact and defeat summary judgment.  *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## B

The interpretation of an insurance contract is a question of law for the courts.  *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995).  "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply."  *Bank of the West*, 2 Cal. 4th 1254, 1264 (1992).  "The principles governing the interpretation of insurance policies in California are well settled."  *Minkler v. Safeco Ins. Co. of America*, 49 Cal. 4th 315, 321 (2010).  The goal "'is to give effect to the parties' mutual intentions.'"  *Id.* (quoting *Bank of the West*, 2 Cal. 4th at 1264). "[T]he intention of the parties is to be ascertained from the writing alone, if possible[.]" Cal. Civ. Code § 1639.  "The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation."  *Waller*, 11

Cal. 4th at 18 (internal quotation marks and citations omitted).  "If contractual language is clear and explicit, it governs." *Minkler*, 49 Cal. 4th at 321 (internal quotation marks omitted).

"'If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect the objectively reasonable expectations of the insured.'" *Inns-by-the-Sea*, 71 Cal. App. 5th at 697 (quoting *Minkler*, 49 Cal. 4th at 321.) That is because "'[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.'" *Bank of the West*, 2 Cal. 4th at 1264–65 (quoting Civ. Code, § 1649).  "Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved *against* the insurer[.]" *Minkler*, 49 Cal. 4th at 321.  "The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer generally drafted the policy and received premiums to provide the agreed protection." *Id*.  "To further ensure that coverage confirms fully to the objectively reasonable expectations of the insured . . . in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer." *Id.* at 322.  To ensure proper construction, "language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract . . . Courts will not strain to create an ambiguity where none exists." *Waller,* 11 Cal.4th at 18.  "The insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies." *Minkler,* 49 Cal.4th at 322.

IV

A

Endurance's first argument concerns how to interpret the Policy's *direct result* requirement under Coverage D.  Specifically, Endurance points to language within Coverage D which provides that Endurance "shall pay, up to the Limits of Liability . . . the Insured's **Business Interruption Losses** and **Extra Expenses** during the Interruption Period that *directly result* from . . . **Biological Agent Condition(s)**[.]"  (Policy § I.D [italics emphasis added].)  The thrust of Endurance's argument is that any Business Interruption Losses and Extra Expenses Sunstone may have sustained due to the suspension of its operations after March 23, 2020 was due to the Massachusetts Order, not a Biological Agent Condition.  Endurance's argument is not persuasive.

To support its argument, Endurance relies upon inapplicable caselaw.  Its principal authority is a recent California Court of Appeal case, *Inns-by-the-Sea v. California Mutual Ins. Co.*, 71 Cal. App. 5th 688 (2021).  (*See* Endurance's MSJ at 19–21.)  There, the California Court of Appeal considered whether the plaintiff, an owner of five lodging facilities, was entitled to insurance coverage after claiming business interruption losses as a result of the California closure orders.  *Id.*  The plaintiff in *Inns* did not purchase an environmental contamination policy like the one Sunstone purchased from Endurance, but a policy for "*direct physical loss of or damage to* Covered Property at the premises . . . caused by or resulting from any Covered Cause of Loss[.]"  *Id.* at 694–95 (emphasis added) (internal quotation marks omitted).  The *Inns* policy also provided "Business Income (and Extra Expense)" and "Civil Authority" coverage, stating that the insurance company would pay "for the actual loss of Business Income you sustain due to the necessary suspension of your operations during the period of restoration."  *Id.* at 695 (internal quotation marks omitted).  The policy also made clear that the "suspension must

be caused *by direct physical loss of or damage to property at [Inn's] premises*[.]" *Id.* (emphasis and alteration in the original).

In deciding that the coverage was not available for Inn's claim, the Court of Appeal agreed that "'the presence of COVID-19 on Plaintiff's property did not cause damage to the property necessitating rehabilitation or restorations efforts,'" as the policy contemplated. *Id.* at 704 (quoting *First & Stewart Hotel Howner, LLC v. Fireman's Fund. Ins. Co.*, 2021 WL 3109724, at *4 (W.D. Wash. July 22, 2021)). Rather, the case "'concern[ed] an invisible virus that is present throughout the world . . . It is that general presence, and not a specific physical harm to covered properties, that has caused governments at all levels to consider restrictions. The question, therefore, is one of widespread economic loss due to the restrictions on human activities, *not the consequence of a direct physical loss or damage to the insured premises*.'" *Id.* (quoting *Associates in Periodontics, PLC v. Cincinnati Ins. Co.*, --- F. Supp. 3d ---, 2021 WL 1976404, at *6 (D. Vt. May 18, 2021)) (emphasis added).

*Inns* is distinguishable from the facts of this case, as are the other similar cases Endurance cites to discussing "damage to property" policies. Nothing in the Policy at issue here requires physical damage or a physical loss of use of the property for coverage to be available. Instead, the coverage is designed to address viruses and other biological agents that interrupt Marriott Boston Long Wharf's operations. (*See* Policy § I.D.) The rationale behind the Court of Appeal decision in *Inns* therefore has little value to the Court's analysis.

But relying on inapplicable authority is not the only problem with Endurance's position. Much of Endurance's argument concerning the "directly results" language in Coverage D is based on the flawed assumption that COVID-19 would not have posed an interruption to Marriot Boston Long Wharf's operations in the absence of the

Massachusetts Order.  To bolster this position, Endurance points to the definition of Business Interruption Losses in the Policy, which provides that Business Interruption Losses are "[t]he actual loss, including **Loss of Rental Income** . . . that would have been earned or incurred by the **Insured** during the **Interruption Period** in the absence of suspension of the **Insured**'s operations due to the *necessary suspension* of business operations resulting directly from . . .  **Biological Agent Condition(s)** at a **Scheduled Location** during the **Interruption Period**[.]"  (Policy § VIII.6 [italics emphasis added].)  What constitutes a "necessary suspension" is not defined.  But Endurance proceeds on the idea that a "necessary suspension" equates to a total shutdown of operations and can only come at the hands of a regulatory authority requiring the hotel to do so.  (*See* Endurance's MSJ at 18.)  It is not clear to the Court why Endurance assumes a suspension means a *total* shutdown of operations nor why a suspension is only necessary when the government forces it to happen.  Assume, for instance, only a portion of a hotel was impacted by a biological agent rather than the entirety of it.  Is Sunstone unable to recover any lost rental income because it can still use other guest rooms?  If the answer is yes that would be a harsh result for a policy that explicitly provides $25,000,000 in coverage for business interruption losses resulting from a virus.  But that cannot be the case because Endurance is reading limitations into the plain text of the Policy that simply do not exist.  If Endurance wanted to limit the extent of its liability to situations in which the hotel's operations were suspended in their entirety and only when a government agency forced it to, it could have easily done so.  *Fireman's Fund Ins. Cos. v. Atl. Richfield Co.*, 94 Cal. App. 4th 842, 852 (2001) ("[S]everal courts have observed an insurance company's failure to use available language to exclude certain type of liability gives rise to the inference that the parties intended not to so limit coverage[.]").  But it did not.

At any rate, even if Sunstone was not forced by the Massachusetts Order to close Marriott Boston Long Wharf, it is likely that its operations would have been necessarily

suspended anyway.  This is evident by the fact that even when Sunstone was able to resume limited operations after the Massachusetts Order was lifted it was not able to "resume[] *normal* operations."[8]  (Stip. ¶ 22 [emphasis added]; *see also* Rocco Decl. ¶ 7.)  It is not difficult to imagine that resuming normal operations would have introduced, at the time, unmitigable risk of further spreading the virus, putting in jeopardy the health of its staff, guests, and the public given that the virus was everywhere.  Simply put, Endurance has not shown that the Massachusetts Order was an intervening circumstance causing Marriott Boston Long Wharf's closure under the terms of the Policy, rather than the virus itself.  (Endurance's MSJ at 18.)

Endurance's view that the Massachusetts Order was an intervening circumstance causing Marriott Boston Long Wharf's suspension also produces an absurd result when read against the objectively reasonable expectations of the insured.  Indeed, it renders Coverage D illusory.  *See Julian v. Hartford Underwriters Ins. Co.*, 35 Cal. 4th 747, 760 (2005) (insurer's interpretation of clear policy language, though reasonable, would render coverage "virtually illusory"); *see also De Bruyn v. Sup. Ct.*, 158 Cal. App. 4th 1213, 1222 (2008) ("application of such broad language in an exclusion might render illusory provisions that purport to cover other perils[.]").  Imagine if a hotel purchased insurance coverage for business losses caused by biological agent conditions, including viruses, impacting its property.  Recognizing the threats a virus could pose to its operations, the hotel pays hundreds of thousands of dollars in premiums for the policy and ensures the limits of liability are in the tens of millions of dollars.  Unfortunately, there is an outbreak of a deadly virus at the hotel, and it cannot accept guests because individuals are falling ill.  The hotel loses considerable sums of money because of the closure.  At some later point, the local health department issues an ordinance requiring that the hotel remains

---

[8] Endurance disputes this but provides nothing to the Court demonstrating that Sunstone's representations, such as that from the Marriott Boston Long Wharf's General Manager, are untrue.  Of course, this would impact the measure of damages Sunstone may ultimately recover, an issue that is not currently before the Court and may properly be the subject of further motions in this case.

shutdown until it may properly assess the risks posed by the outbreak and learn how to stop it.  When the hotel goes to file a claim, the insurance company denies coverage, stating that its losses were due to the ordinance, not the virus.

It would make little sense in such a scenario to suggest that the hotel's closure was a result of the ordinance alone.  After all, the only reason the ordinance exists in the first place is because of the virus.  But Endurance ignores that fact, insisting that the Massachusetts Order had nothing to do with the specific presence of COVID-19 at Marriott Boston Long Wharf.  Though that argument may hold weight had Marriott Boston Long Wharf not been the site of the Biogen conference, believed to be a super-spreader event, it is not compelling here.  The Massachusetts Order may not have been issued solely to stop the spread of the virus disseminating from Marriott Boston Long Wharf, but it most certainly was issued to prevent future super-spreader events like the Biogen conference which took place at Marriott Boston Long Wharf.  (Stip., Ex. I [Massachusetts Order] at 1 ["[T]he Department of Public Health is urging all residents of the Commonwealth to limit activities outside of the home and to practice social distancing at all times . . . to limit the spread of this highly contagious and potentially deadly virus[.]"].)  It is simply undeniable the Massachusetts Order was designed, at least in part, to prevent the virus's spread because of the hotel's operations.  (*See id.*) Suggesting coverage does not exist for Sunstone's claim because the Massachusetts Order is an intervening cause of Sunstone's Business Interruption Losses is not reasonable because it does not disprove that the virus itself is the origin of Marriott Boston Long Wharf's business interruption.  The Massachusetts Order does not exist without the virus.  But the virus, and the interruption it causes, certainly exists without the Massachusetts Order.[9]

---

[9] To be clear, nothing in this Court's analysis concerning the "direct result" requirement should be interpreted as a finding that Sunstone has shown it has proven that its Business Interruption Losses or Extra Expenses were a direct result of the virus.  That poses issues of fact that are currently not before the Court and may be presented by Sunstone in a later motion or at trial.

B

The Court must also resolve the dispute between the parties over how to interpret the provision governing the end of the Interruption Period.[10]  Based upon the parties' briefing, there seems to be no dispute that there was some interruption to Marriott Boston Long Wharf's operations.  The crux of the parties' dispute then is not about whether Coverage D applies but over what duration of time Coverage D applies.

Endurance argues that the Interruption Period ended as soon as the Massachusetts Order took effect on March 24, 2020.  (Endurance's MSJ at 13–14.)  Sunstone counters that the Interruption Period lasted until March 2021, or for one year—the maximum duration of the Interruption Period under the Policy.  (Sunstone's MSJ at 4.)  Due to the ambiguity in the Policy and Sunstone's objectively reasonable expectations, the Court concludes that as long as the virus was a source of Marriott Boston Long Wharf's Business Interruption Losses, the Interruption Period continued, ending no later than March 2021.[11]

Under Section D.1 of Coverage D, the Interruption Period ends if "the Biological Agent Condition(s) [COVID-19] no longer *is a source* of the interruption to the Insured's operations, regardless of whether the interruption is continuing for any other reason after

---

[10] The issue of when exactly the Interruption Period began under the Policy is not currently before the Court.  At the hearing held on these cross-motions for summary judgment, counsel for Endurance clarified that the parties would brief that issue at a later date.  But there appears to be no dispute that there was at least some interruption to Marriott Boston Long Wharf's operations and therefore the Interruption Period was triggered.

[11] The purpose of the cross-motions is not to make factual findings about the extent of Marriott Boston Long Wharf's Business Interruption Losses but how to interpret the Policy provisions.  The record is currently insufficient to determine the extent of Marriott Boston Long Wharf's Business Interruption Losses, though Sunstone presents evidence that its operations did not resume fully even after the Massachusetts Order was lifted.  (*See* Stip. ¶ 22, Rocco Decl. ¶ 7.)

the Biological Agent Condition(s) has been addressed."[12]  (Policy § I.D.1.)  According to Endurance, because Biological Agent Condition is defined as "the presence of Biological Agents *at, upon, or within* a Scheduled Location," (*Id.* § VIII.4 [emphasis added]), then the Interruption Period ended as soon as the physical presence of COVID-19 at Marriott Boston Long Wharf was remediated because the virus was "no longer a source of the interruption[,]" (Endurance's MSJ at 12–15).  Endurance argues the Massachusetts Order, and only the Massachusetts Order, forced Marriott Boston Long Wharf's continued suspension once it took effect.  (*Id.*)

There are several problems with Endurance's argument.  First, Endurance ignores the fact that the purpose of the provisions defining the end of the Interruption Period is to limit Endurance's liability under the Policy and exclude other causes from coverage.  As an exclusion, Endurance must "establish that its interpretation is the *only* reasonable one."  *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 655 (2003) (emphasis in original).  But a close review of the provisions governing the beginning and ending of the Interruption Period establish that the language surrounding the end of the Interruption Period is ambiguous.  *See id.* at 647 ("key term[s] in the [policy] . . .  specifically defined . . . cannot be undone by different notions of [the term] outside the policy, unrelated to the policy language, unless such a reading produce[s] absurd results[.]").

That is because the language used to define the ending of the Interruption Period is much broader than the language used to define the beginning of the Interruption Period.

---

[12] To bolster this interpretation, Endurance points to other language in the Policy that states that the "Interruption Period will be deemed to have ended . . . even if it is not *physically possible* for such operations to resume for reasons other than the physical presence of . . . Biological Agents at a Scheduled Location."  (Endurance's MSJ at 14, Policy VIII § 24 [emphasis added].)  But as Sunstone points out in its opposition brief, it was never physically impossible for Marriott Boston to resume its operations.  (Dkt. 42 [Sunstone's Opposition to Endurance's MSJ] at 15–16.)  Though resuming operations may have posed a risk of contracting or spreading COVID-19, that does not mean that Marriott Boston did not have the physical means to do so anyway.

To begin the Interruption Period, the "Biological Agent Condition(s)" must "*directly interrupt*[] the Insured's operations[.]"  (Policy § VIII.24.a [emphasis added].)  It makes sense that this would require the physical presence of a virus, such as when a person infected with the virus is on the hotel property or when a person infected with the virus has spread it onto surfaces or objects at the hotel.  Otherwise, an outbreak of a virus anywhere in the world that may indirectly interrupt Marriott Boston Long Wharf's operations.  That is not the policy Sunstone purchased, nor is it how the Court reads the policy at issue in this case.

The Interruption Period ends, however, when the "Biological Agent Condition(s) *no longer is a source of the interruption* to the Insured's operations[.]"  (Policy §VIII.4 [emphasis added].)  In other words, the Interruption Period continues for as long as the virus is impacting the property, whether that be directly or *indirectly*.  It is difficult to imagine a situation in which the physical presence of a virus is not directly impacting Marriott Boston Long Wharf's operations.  But requiring a physical presence of a virus to define both the beginning and ending point of the Interruption Period's duration would severely limit how long the Interruption Period could last, even if the hotel continues to feel the impacts of the virus long after the hotel has been cleaned.  That does not align with the plain text of the Policy which allows for coverage even when the virus is an indirect source of the interruption rather than a direct cause.

To be clear, the Policy does not define what "directly interrupts" means nor what "a source of the interruption" means, but the everyday usage of these terms strongly suggests that whether something is *a* source of the interruption to Marriott Boston Long Wharf's operations encapsulates a broader category of potential causes of the interruption than what constitutes a direct interruption to Marriott Boston Long Wharf's operations.  This is significant because if there is no distinction between whether something is "directly interrupting" operations and whether something is "a source of the

interruption," as Endurance would have the Court believe, then the phrase "a source" in the Policy would mean the exact same thing as "directly interrupting" the operations.  But the "whole of a contract" is to be taken together so as to "give effect to *every part* of the policy with each clause helping to interpret the other," *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1114–15 (1999) (emphasis added) (internal quotations and citations omitted), and "'we must avoid interpretations that would create redundance in policy language[,]'" *Great Western Drywall, Inc. v. Interstate Fire & Cas. Co.*, 161 Cal. App. 4th 1033, 1042 (2008) (quoting *Carmel Development Co. v. RLI Ins. Co.*, 126 Cal. App. 4th 502, 511 (2005)); *Mirpad, LLC v. Cal Ins. Guar. Ass'n*, 132 Cal. App. 4th 1058, 1072–73 (2005) ("It is a very fundamental principle that policy language be so construed as to give effect to every term."); *see also Total Intermodal Servs. Inc. v. Travelers Prop. Cas. Co. of Am.*, 2018 WL 3829767, at *3 (C.D. Cal. July 11, 2018) (discussing the "black-letter canon of contract interpretation—that every word be given a meaning").

The Court's interpretation of the provision governing the end of the Interruption Period is also supported by Sunstone's objectively reasonable expectations.  *See Inns-by-the-Sea*, 71 Cal. App. 5th at 697 (quoting *Minkler*, 49 Cal. 4th at 321.) ("If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect the objectively reasonable expectations of the insured.") (internal quotation marks omitted); *see also Bank of the West*, 2 Cal. 4th at 1264–65(1992) ("If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.") (internal quotation marks omitted).  Sunstone paid hundreds of thousands of dollars in premiums for the Policy in this case and specifically elected for an "add-on" coverage to provide it with $25,000,000 worth of insurance should a virus interrupt its hotels' operations.  (Policy at 14.)  It would be counter to the reasonable expectations of Sunstone if the Policy excluded time the virus was interrupting Marriott Boston Long Wharf's operations just because the hotel did not test every single day to confirm whether

individuals physically present at the property had the virus or whether they spread the virus onto surfaces or objects at the hotel.  This is especially true because COVID-19 is an invisible virus that was present at the hotel and then spread everywhere on and off the property.

Moreover, Endurance's position on this issue seems to be even more extreme than what it represents in its brief.  Taking Endurance's argument to its logical conclusion means that even the Boston Public Health Department's two-week shutdown of Marriott Boston Long Wharf would be excluded from the Interruption Period, reducing the Interruption Period's duration to just the time it took to clean the property.  But the Policy does not state that the Interruption Period ends when the clean-up period is over.  Indeed, the definition of the Interruption Period makes no mention of the clean-up period at all. (*See* Policy § VIII.24.)  And clean-up periods for a virus like COVID-19 would be undoubtedly short.  In fact, in earlier motions before this Court, Endurance asserted that the clean-up period was only two days.  (*See* Dkt. 21 [Court's Order on Endurance's Motion to Dismiss].)  Why would a company pay hundreds of thousands of dollars in premiums for $25,000,000 worth of coverage when an interruption caused only by the physical presence of a virus would result in losses and costs far less than the premium the company paid?  Endurance does not attempt to respond to this question and the Court's only conclusion from that omission is that no rational company would do so.  Indeed, it would be an absurd result if a virus were to interrupt Marriott Boston Long Wharf's operations, continue to do so even after the clean-up has occurred, but the Policy would only cover the limited interruption caused by the cleanup rather than the extensive interruption caused by the virus itself.  That is not what Sunstone or Endurance bargained for and neither party can reasonably expect such limitations given the millions of dollars of insurance coverage the Policy provides.

The closest Endurance comes to addressing this issue is its discussion of prior claims Sunstone has made under the Policy.  (Endurance MSJ at 7–8.)  But the examples Endurance provides do little to move the needle in its favor.  Four out of the five claims appear to be made under Coverage C of the Policy, which provides coverage for cleanup costs associated with biological agents, rather than Coverage D which encompasses business interruption losses caused by viruses and other biological agents.[13]  (*See, e.g. id.* [Endurance sought $1,923,467 in mold remediation costs for two hotels in Houston after Hurricane Harvey], [Sunstone submitted a $420,000 claim to remediate mold at Hilton Times Square], [Sunstone estimated costs for mold remediation at the Renaissance Westchester would be between $25,000 and $50,000], [Sunstone submitted a claim for Legionella at Embassy Suites Chicago "incurring Cleanup Costs and legal fees totaling over $100,000"].)  Sunstone confirms as much in its opposition brief when it addresses these examples.  (*See* Dkt. 42 [Sunstone's Opposition to Endurance's MSJ] at 20 ["That Sunstone previously submitted Coverage C **CleanUp** [sic] Cost claims and needed to satisfy the $100,000 Coverage C SIR to do so is entirely irrelevant to any issue before this Court."].)  The only instance Endurance provides where Sunstone sought Business Interruption and Extra expenses was for a separate occurrence of mold at Renaissance Westchester, with cleanup costs and business interruption and extra expenses totaling $201,050.  (*Id.* at 7.)  But $201,050 does not approach the $25,000,000 worth of coverage Sunstone paid for, let alone the $40,000,000 of aggregate coverage it is entitled to under the Policy.  Considering the Policy "as a whole, the circumstances of the case in which the claim arises and common sense[,]" the Court finds it is objectively reasonable for Sunstone to expect that the Interruption Period would last for as long as COVID-19 remained a source of the interruption to its operations, even if it was not physically present in a person on the hotel property or spread onto the surface or object on the hotel

---

[13] Coverage C of the Policy also provides $25,000,000 worth of coverage.

property.[14]   *Nissel v. Certain Underwriters at Lloyd's of London*, 62 Cal. App. 4th 1103, 1111–12 (1998) (internal quotation marks and citations omitted).

C

Endurance also attempts to deny Sunstone coverage by limiting the scope of the Interruption Period by pointing to two exclusions within the definition of the Interruption Period in the Policy.  The first requires that the Interruption Period end even if operations at Marriott Boston Long Wharf cannot resume due to "regulatory reasons."  The second excludes from the Interruption Period any delay in resuming operations at the property due to a "ordinance or law regulating the construction, use or repair, or demolition of property."  The Court takes each in turn.

Coverage D provides that "the Interruption Period will be deemed to have ended (1) even if operations cannot resume at the Scheduled Location for regulatory reasons[.]" (Policy § VIII.24.)  Endurance argues that the Massachusetts Order was "undoubtedly 'regulatory'" and that "[e]ven if Marriott Long Wharf was initially closed to address the presence of the virus on the premises, the hotel's operations remained suspended after March 26, 2020 solely because of the statewide Massachusetts Order."  (Endurance's MSJ at 15–16; Sunstone's RSUF ¶ 24.)  Though not binding upon this Court, some courts have found that the COVID-19 related shutdown orders "were governmental orders *regulating* the use of property and having the force of law."  *Newschops Restaurant Comcast LLC v. Admiral Indem. Co.*, 507 F. Supp. 3d 616, 626 (E.D. Pa. 2020)

---

[14] Sunstone has yet to make a sufficient factual showing that COVID-19 caused Business Interruption Losses and/or Extra Expenses pursuant to the Policy.  This obviously requires a more developed factual record than the one currently before the Court.  More specifically, Sunstone will need to present testimony and evidence showing the reduced occupancy rates and safety measures implemented at the hotel, as well as its lost profits.  Sunstone would also be well-advised to retain an expert in public health or in infectious diseases to explain why the reductions in operations were necessary to limit the spread of COVID-19 at the Marriott Boston Long Wharf.

(emphasis added); *see also Isaac's Deli Inc. v. State Auto Prop. And Cas. Ins. Co.*, 539 F. Supp. 3d 424, 433 (E.D. Pa. 2021) ("The Court also finds that the Governor's order *regulated* the use of Plaintiff's property.") (emphasis added); *Image Dental, LLC v. Citizens Ins. Co. of Am.*, 542 F. Supp. 3d 582, 593 (N.D. Ill. 2021) (insured's COVID-19-related losses "stemmed from a legal directive *regulating* the use of its property") (emphasis added).  Others have found the opposite.  *See, e.g., Elegant Massage v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 380 (E.D. Va. 2020); *North State Deli v. Cincinnati Ins. Co.*, 2020 WL 6281507, at *4 (N.C. Superior Ct. Oct. 9, 2020).

Endurance's argument is a strawman.  Though the Court agrees with the majority of appellate courts that have held COVID-19-related shutdown ordinances are regulatory in nature, as already explained, Endurance has not shown that the Massachusetts Order was the actual reason there was an interruption to Marriott Boston Long Wharf's operations.[15]  There is no question that the virus itself interrupted Marriott Boston Long Wharf's operations because even if the State of Massachusetts had allowed Marriott Boston Long Wharf to operate at full capacity, the hotel could not have done so.  (Rocco Decl. ¶ 7.)  To limit the spread of COVID-19 at the Marriott Boston Long Wharf, Sunstone had to reduce the occupancy of the hotel, socially distance people, and implement numerous safety measures.  Again, this had to be the case because even after Massachusetts lifted its suspension order, Marriott Boston Long Wharf was unable to resume its normal operations.  (Sunstone's MSJ at 4; Stip. § 22; Rocco Decl. ¶ 7.)

Endurance also maintains that the Interruption Period excludes any delay caused by an ordinance or law regulating the use of property, like the Massachusetts Orders.

---

[15] Endurance is quick to point out that Sunstone stipulated that "Marriott Boston Long Wharf remained closed through July 7, 2020 because of the Massachusetts Order."  (Stip. ¶ 16.)  But that does not mean that Sunstone stipulated that COVID-19 was "no longer a source of the interruption" to its operations. The two inquiries are fundamentally different and the language of the Policy allows for coverage even when COVID-19 is not the only source of the interruption, contrary to Endurance's position.

Specifically, Endurance offers that "even if the property was initially closed to address the presence of the virus on the premises, the reopening was subsequently delayed due to the Massachusetts Order regulating the 'use' of property." (Endurance's MSJ at 16.) But this provision is not applicable to the facts presented. Stated in full, the exclusion provides that the "Interruption Period does not include any delay caused by the enforcement of any local or state ordinance or law regulating the *construction, use or repair, or demolition* of property." (Policy § VIII.24 [emphasis added].) Endurance takes out of context and analyzes in isolation the word "use" to argue that because the Massachusetts Order was an "ordinance or law" regulating how Marriott Boston Long Wharf could be used, then any period of time the hotel was closed because of the Massachusetts Order must be excluded from the Interruption Period. But Endurance mischaracterizes the scope of the "ordinance or law" exclusion.

The exclusion does not apply to *any* or *all* ordinances or laws that may impact Marriott Boston Long Wharf, but only those directed at the physical aspects of the hotel. Endurance cannot use a provision in a Policy that was not designed to capture a government's response to an outbreak of a virus to avoid coverage here. As another federal district court reasoned when analyzing similar policy language, "use" must be read in "the term's context" and here, the word "use" is used in the sense of whether it is physically possible to use the premises, not how the property may be used. *Penn Asian Senior Services v. Selective Insurance Co. of South Carolina*, 2021 WL 4478215, at *5 (E.D. Pa. Sept. 30, 2021). That is, "'[u]se is paired in the policy with 'construction' and 'repair,' two words that point to the 'physical aspects of the property.' Given that pairing, the regulation on use must pertain to the 'physical use' of the property, not the use of a property for a particular purpose." *Id.* "[T]he exclusion might apply if an ordinance forbade using the covered building because it was structurally unsound, but not if an ordinance declared that an otherwise-habitable building is no longer zoned for a certain commercial purpose." *Id.*; *see also Frank Van's Auto Tag, LLC v. Selective Ins.*

*Co. of the Se.*, 516 F. Supp. 3d 450, 461 (E.D. Pa. 2021) ("use" alongside "construction"
and "repair" suggest that it "relates to the physical structural integrity of the property");
*Elegant Massage, LLC v. State Farm Mut. Auto Ins. Co.*, 506 F. Supp. 3d 360, 379–80
(E.D. Va. 2020) ("Executive Orders, which were temporary restrictions that impacted the
Plaintiff's business were not ordinance or laws such as safety regulations or laws passed
by a legislative body regulating the construction, use, repair, removal of debris, or
physical aspects of the property.").

        This interpretation again aligns with the objectively reasonable expectations of
Sunstone.  The Policy provides millions of dollars worth of coverage for business
interruption losses caused by biological agents like COVID-19.  It defies logic if those
losses do not include periods of time the business is interrupted because of an ordinance
of law relating to the virus.  That is especially true when the only provision in the Policy
excluding interruptions caused by "ordinance of law" are clearly directed towards the
physical structural aspects of the property, rather than limitations on hotel capacity or the
lengths of stay of hotel guests.

        Nevertheless, Endurance cites a number of cases in which courts have found that
similar shutdown orders are "ordinances or laws" within the meaning of similar policy
exclusions, barring coverage for the insured's claims.  (Endurance's MSJ at 16–17.)  All
are distinguishable.  In *Bradley Hotel Corp. v. Aspen Specialty Insurance Co.*, the
Seventh Circuit considered insurance coverage issues related to the partial closure of a
hotel during the COVID-19 pandemic.  19 F.4th 1002, 1004 (7th Cir. 2021).  The
Seventh Circuit held that the term "direct physical loss of or damage to" property did not
apply to a "business's loss of use of the property without any physical alteration." *Id.* at
1005.  The Seventh Circuit also held that the "loss of use exclusion and the ordinance or
law exclusion in this policy provide separate bars to coverage." *Id.*  But there, the
plaintiff conceded that the relevant closure orders regulated the use of property, and the

Seventh Circuit did not consider whether the provision "regulating the construction, use or repair of any property" was meant to apply only to physical aspects of the property, challenging instead whether the closure orders were ordinances or laws in the first place. *See id.* at 1008 ("[Plaintiff] acknowledges that the Illinois closure orders regulated the use of property."); *see also Gavrilides Management Co., LLC v. Michigan Ins. Co.*, --- N.W.2d ---, 2022 WL 301555, at *5 (Mich. Ct. App. Feb. 1, 2022) (similar); *Newchops Restaurant Comcast LLC v. Admiral Indemnity Co.*, 507 F. Supp. 3d 616, 625 (E.D. Penn. 2020) (finding Philadelphia shut-down Order to be a law or ordinance regulating the use of property without discussion of whether use means physical use or how the property may be used).  Similarly in *Isaac's Deli, Inc. v. State Auto Property and Casualty Ins. Co.*, the district court did not question whether the government orders fit into the exclusion for laws or ordinances regulating the "construction, use, or repair of any property" reasoning that "Plaintiff has conceded this point, stating unequivocally that [the insured] was expressly forbidden to *use*, possess, and enjoy its properties for their traditional and intended purpose."  539 F. Supp. 3d 424, 433 (E.D. Penn. 2021) (emphasis in original) (internal quotation marks omitted).  In *JD Cinemas, Inc. v. Northfield Ins. Co.*, a trial court considered exclusionary language in a policy that appears much broader than the language at issue here, explicitly stating that "losses attributable to enforcement or compliance with *any* ordinance or law are not covered."  2021 WL 2626973, at *7 (N.Y. March 5, 2021) (emphasis added).  Finally, the court in *Image Dental, LLC v. Citizens Ins. Co. of America* also did not consider similar exclusionary language at all but merely described that the plaintiff alleged "that it suffered a loss from Executive Orders regulating the use of its property."  543 F. Supp. 3d 582, 593 (N.D. Ill. 2021).  Obviously, what a plaintiff has alleged in another case without more analysis from the court concerning those allegations is not helpful to the Court's inquiry here.

Given the absence of authority supporting Endurance's interpretation of the "ordinance or law" exclusion within Coverage D, the Court has no hesitation in

concluding that the "ordinance or law" exclusion does not apply here.  The Massachusetts Orders were not regulating the "construction, use or repair, or demolition of property" because they had nothing to do with the structural aspects of the property.  Interpreting the provision so that it encompasses shutdown orders that were issued in response to COVID-19 would impermissibly expand the scope of the exclusion and ignore the objectively reasonable expectations of Sunstone.

V

For the foregoing reasons, Endurance's Motion for Partial Summary Judgment is **DENIED**.  Sunstone's Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  The Court **GRANTS** Sunstone's motion with respect to how to interpret the provision governing the ending of the Interruption Period.  The Court **DENIES** Sunstone's motion that the Court make the factual determination that the Interruption Period ended in March 2021 specifically.  Discovery in this case has not yet closed.  Whether COVID-19 remained a source of Sunstone's Business Interruption Losses and/or Extra Expenses requires a more developed factual record governed by the guidance provided in this order.  Either party may make a motion concerning that issue in future filings once the record has been appropriately supplemented.

DATED:     June 15, 2022

_____

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE